(Slip Opinion) OCTOBER TERM, 2006 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## ZUNI PUBLIC SCHOOL DISTRICT NO. 89 ET AL. *v.* DEPARTMENT OF EDUCATION ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

No. 05–1508.   Argued January 10, 2007—Decided April 17, 2007

The Federal Impact Aid Program provides financial assistance to local school districts whose ability to finance public school education is adversely affected by a federal presence. The statute prohibits a State from offsetting this federal aid by reducing state aid to a local district. To avoid unreasonably interfering with a state program that seeks to equalize per-pupil expenditures, the statute contains an exception permitting a State to reduce its own local funding on account of the federal aid where the Secretary of Education finds that the state program "equalizes expenditures" among local school districts. 20 U. S. C. §7709(b)(1). The Secretary is required to use a formula that compares the local school district with the greatest per-pupil expenditures in a State to the school district with the smallest per-pupil expenditures. If the former does not exceed the latter by more than 25 percent, the state program qualifies as one that "equalizes expenditures." In making this determination, the Secretary must, *inter alia,* "disregard [school districts] with per-pupil expenditures . . . above the 95th percentile or below the 5th percentile of such expenditures in the State." §7709(b)(2)(B)(i). Regulations first promulgated 30 years ago provide that the Secretary will first create a list of school districts ranked in order of per-pupil expenditure; then identify the relevant percentile cutoff point on that list based on a specific (95th or 5th) percentile of *student population*—essentially identifying those districts whose students account for the 5 percent of the State's total student population that lies at both the high and low ends of the spending distribution; and finally compare the highest spending and lowest spending of the remaining school districts to see whether they satisfy the statute's requirement that the disparity between them not

exceed 25 percent.

Using this formula, Department of Education officials ranked New Mexico's 89 local school districts in order of per-pupil spending for fiscal year 1998, excluding 17 schools at the top because they contained (cumulatively) less than 5 percent of the student population and an additional 6 districts at the bottom. The remaining 66 districts accounted for approximately 90 percent of the State's student population. Because the disparity between the highest and lowest of the remaining districts was less than 25 percent, the State's program "equalize[d] expenditures," and the State could offset federal impact aid by reducing its aid to individual districts. Seeking further review, petitioner school districts (Zuni) claimed that the calculations were correct under the regulations, but that the regulations were inconsistent with the authorizing statute because the Department must calculate the 95th and 5th percentile cutoffs based solely on the number of school districts without considering the number of pupils in those districts. A Department Administrative Law Judge and the Secretary both rejected this challenge, and the en banc Tenth Circuit ultimately affirmed.

*Held:* The statute permits the Secretary to identify the school districts that should be "disregard[ed]" by looking to the *number of the district's pupils* as well as to the size of the district's expenditures per pupil. Pp. 7–17.

(a) The "disregard" instruction's history and purpose indicate that the Secretary's calculation formula is a reasonable method that carries out Congress' likely intent in enacting the statutory provision. For one thing, that method is the kind of highly technical, specialized interstitial matter that Congress does not decide itself, but delegates to specialized agencies to decide. For another, the statute's history strongly supports the Secretary. The present statutory language originated in draft legislation sent by the Secretary himself, which Congress adopted without comment or clarification. No one at the time—no Member of Congress, no Department of Education official, no school district or State—expressed the view that this statutory language was intended to require, or did require, the Secretary to change the Department's system of calculation, a system that the Department and school districts across the Nation had followed for nearly 20 years. Finally, the purpose of the disregard instruction, which is evident in the language of the present statute, is to exclude statistical outliers. Viewed in terms of this purpose, the Secretary's calculation method is reasonable, while the reasonableness of Zuni's proposed method is more doubtful as the then Commissioner of Education explained when he considered the matter in 1976. Pp. 7–11.

(b) The Secretary's method falls within the scope of the statute's

plain language. Neither the legislative history nor the reasonableness of the Secretary's method would be determinative if the statute's plain language unambiguously indicated Congress' intent to foreclose the Secretary's interpretation. See *Chevron, supra,* at 842–843. That is not the case here. Section 7709(b)(2)(B)(i)'s phrase "*above the 95th percentile . . . of . . . [per-pupil] expenditures*" (emphasis added) limits the Secretary to calculation methods involving per-pupil expenditures. It does not tell the Secretary which of several possible methods the Department must use, nor rule out the Secretary's present formula, which distributes districts in accordance with per-pupil expenditures, while essentially weighting each district to reflect the number of pupils it contains. This interpretation is supported by dictionary definitions of "percentile," and by the fact that Congress, in other statutes, has clarified the matter at issue to avoid comparable ambiguity. Moreover, "[a]mbiguity is a creature not [just] of definitional possibilities but [also] of statutory context." *Brown* v. *Gardner*, 513 U. S. 115, 118. Context here indicates that both students and school districts are of concern to the statute, and, thus, the disregard instruction can include within its scope the distribution of a ranked population consisting of pupils (or of school districts weighted by pupils), not just a ranked distribution of unweighted school districts alone. Finally, this Court is reassured by the fact that no group of statisticians, nor any individual statistician, has said directly in briefs, or indirectly through citation, that the language in question cannot be read the way it is interpreted here. Pp. 11–17.

437 F. 3d 1289, affirmed.

BREYER, J., delivered the opinion of the Court, in which STEVENS, KENNEDY, GINSBURG, and ALITO, JJ., joined. STEVENS, J., filed a concurring opinion. KENNEDY, J., filed a concurring opinion, in which ALITO, J., joined. SCALIA, J., filed a dissenting opinion, in which ROBERTS, C. J., and THOMAS, J., joined, and in which SOUTER, J., joined as to Part I. SOUTER, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 05–1508

## ZUNI PUBLIC SCHOOL DISTRICT NO. 89, ET AL., PETITIONERS *v.* DEPARTMENT OF EDUCATION ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

[April 17, 2007]

JUSTICE BREYER delivered the opinion of the Court.

A federal statute sets forth a method that the Secretary of Education is to use when determining whether a State's public school funding program "equalizes expenditures" throughout the State. The statute instructs the Secretary to calculate the disparity in per-pupil expenditures among local school districts in the State. But, when doing so, the Secretary is to "disregard" school districts *with per-pupil expenditures . . . above the 95th percentile or below the 5th percentile of such expenditures . . . in the State."* 20 U. S. C. §7709(b)(2)(B)(i) (emphasis added).

The question before us is whether the emphasized statutory language permits the Secretary to identify the school districts that should be "disregard[ed]" by looking to the *number of the district's pupils* as well as to the size of the district's expenditures per pupil. We conclude that it does.

I

A

The federal Impact Aid Act, 108 Stat. 3749, as amended, 20 U. S. C. §7701 *et seq.*, provides financial assistance to

local school districts whose ability to finance public school education is adversely affected by a federal presence. Federal aid is available to districts, for example, where a significant amount of federal land is exempt from local property taxes, or where the federal presence is responsible for an increase in school-age children (say, of armed forces personnel) whom local schools must educate. See §7701. The statute typically prohibits a State from offsetting this federal aid by reducing its own state aid to the local district. If applied without exceptions, however, this prohibition might unreasonably interfere with a state program that seeks to equalize per-pupil expenditures throughout the State, for instance, by preventing the state program from taking account of a significant source of federal funding that some local school districts receive. The statute consequently contains an exception that permits a State to compensate for federal impact aid where "the Secretary [of Education] determine[s] and certifies . . . that the State has in effect a program of State aid that *equalizes* expenditures for free public education among local [school districts] in the State." §7709(b)(1) (2000 ed., Supp. IV) (emphasis added).

The statute sets out a formula that the Secretary of Education must use to determine whether a state aid program satisfies the federal "equaliz[ation]" requirement. The formula instructs the Secretary to compare the local school district with the greatest per-pupil expenditures to the school district with the smallest per-pupil expenditures to see whether the former exceeds the latter by more than 25 percent. So long as it does not, the state aid program qualifies as a program that "equalizes expenditures." More specifically the statute provides that "a program of state aid" qualifies, *i.e.*, it "equalizes expenditures" among local school districts if,

"in the second fiscal year preceding the fiscal year for

which the determination is made, the amount of per-pupil expenditures made by [the local school district] with the highest such per-pupil expenditures . . . did not exceed the amount of such per-pupil expenditures made by [the local school district] with the lowest such expenditures . . . by more than 25 percent." §7709(b)(2)(A) (2000 ed.).

The statutory provision goes on to set forth what we shall call the "disregard" instruction. It states that, when "making" this "determination," the "*Secretary shall . . . disregard [school districts] with per-pupil expenditures . . . above the 95th percentile or below the 5th percentile of such expenditures.*" §7709(b)(2)(B)(i) (emphasis added). It adds that the Secretary shall further:

"take into account the extent to which [the state program reflects the special additional costs that some school districts must bear when they are] geographically isolated [or when they provide education for] particular types of students, such as children with disabilities." §7709(b)(2)(B)(ii).

## B

This case requires us to decide whether the Secretary's present calculation method is consistent with the federal statute's "disregard" instruction. The method at issue is contained in a set of regulations that the Secretary first promulgated 30 years ago. Those regulations essentially state the following:

When determining whether a state aid program "equalizes expenditures" (thereby permitting the State to reduce its own local funding on account of federal impact aid), the Secretary will first create a list of school districts ranked in order of per-pupil expenditure. The Secretary will then identify the relevant percentile cutoff point on that list on the basis of a specific (95th or 5th) percentile of *student*

*population*—essentially identifying those districts whose
students account for the 5 percent of the State's total
student population that lies at both the high and low ends
of the spending distribution.  Finally the Secretary will
compare the highest spending and lowest spending school
districts of those that remain to see whether they satisfy
the statute's requirement that the disparity between them
not exceed 25 percent.

The regulations set forth this calculation method as
follows:

> "[D]eterminations of disparity in current expenditures
> . . . per-pupil are made by—
> "(i)  Ranking all [of the State's school districts] on the
> basis of current expenditures . . . per pupil [in the
> relevant statutorily determined year];
> "(ii)  Identifying those [school districts] that fall at the
> 95th and 5th percentiles of the total number of pupils
> in attendance [at all the State's school districts taken
> together]; and
> "(iii)  Subtracting the lower current expenditure . . .
> per pupil figure from the higher for those [school dis-
> tricts] identified in paragraph (ii) and dividing the dif-
> ference by the lower figure."  34 CFR pt. 222, subpt.
> K, App., ¶1 (2006) (emphasis deleted).

The regulations also provide an illustration of how to
perform the calculation:

> "In State X, after ranking all [school districts] in order
> of the expenditures per pupil for the [statutorily de-
> termined] fiscal year in question, it is ascertained by
> counting the number of pupils in attendance in those
> [school districts] in ascending order of expenditure
> that the 5th percentile of student population is
> reached at [school district A] with a per pupil expendi-
> ture of $820, and that the 95th percentile of student
> population is reached at [school district B] with a per

pupil expenditure of $1,000. The percentage disparity between the 95th percentile and the 5th percentile [school districts] is 22 percent ($1000−$820 = $180/$820)." *Ibid.*

Because 22 percent is less than the statutory "25 percent" requirement, the state program in the example qualifies as a program that "equalizes expenditures."

C

This case concerns the Department of Education's application of the Secretary's  regulations to New Mexico's local district aid program in respect to fiscal year 2000. As the regulations require, Department officials listed each of New Mexico's 89 local school districts in order of per-pupil spending for fiscal year 1998. (The calculation in New Mexico's case was performed, as the statute allows, on the basis of per-pupil *revenues*, rather than per-pupil *expenditures*. See 20 U. S. C. §7709(b)(2)(A). See also Appendix B, *infra.* For ease of reference we nevertheless refer, in respect to New Mexico's figures and throughout the opinion, only to "per-pupil expenditures.") After ranking the districts, Department officials excluded 17 school districts at the top of the list because those districts contained (cumulatively) less than 5 percent of the student population; for the same reason, they excluded an additional 6 school districts at the bottom of the list.

The remaining 66 districts accounted for approximately 90 percent of the State's student population. Of those, the highest ranked district spent $3,259 per student; the lowest ranked district spent $2,848 per student. The difference, $411, was less than 25 percent of the lowest per-pupil figure, namely $2,848. Hence, the officials found that New Mexico's local aid program qualifies as a program that "equalizes expenditures." New Mexico was therefore free to offset federal impact aid to individual districts by reducing state aid to those districts.

Two of New Mexico's public school districts, Zuni Public School District and Gallup-McKinley County Public School District (whom we shall collectively call Zuni), sought further agency review of these findings. Zuni conceded that the Department's calculations were correct in terms of the Department's own regulations. Zuni argued, however, that the regulations themselves are inconsistent with the authorizing statute. That statute, in its view, requires the Department to calculate the 95th and 5th percentile cutoffs solely on the basis of the number of school districts (ranked by their per-pupil expenditures), without any consideration of the number of pupils in those districts. If calculated as Zuni urges, only 10 districts (accounting for less than 2 percent of all students) would have been identified as the outliers that the statute instructs the Secretary to disregard. The difference, as a result, between the highest and lowest per-pupil expenditures of the remaining districts (26.9 percent) would exceed 25 percent. Consequently, the statute would forbid New Mexico to take account of federal impact aid as it decides how to equalize school funding across the State. See N. M. Stat. Ann. §22–8–1 *et seq*. (2006).

A Department of Education Administrative Law Judge rejected Zuni's challenge to the regulations. The Secretary of Education did the same. Zuni sought review of the Secretary's decision in the Court of Appeals for the Tenth Circuit. 393 F. 3d 1158 (2004). Initially, a Tenth Circuit panel affirmed the Secretary's determination by a split vote (2 to 1). Subsequently, the full Court of Appeals vacated the panel's decision and heard the matter en banc. The 12-member en banc court affirmed the Secretary but by an evenly divided court (6 to 6). 437 F. 3d 1289 (2006). Zuni sought certiorari. We agreed to decide the matter.

## II

### A

Zuni's strongest argument rests upon the literal language of the statute. Zuni concedes, as it must, that if the language of the statute is open or ambiguous—that is, if Congress left a "gap" for the agency to fill—then we must uphold the Secretary's interpretation as long as it is reasonable. See *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 842–843 (1984). See also *Christensen* v. *Harris County*, 529 U. S. 576, 589, n. (SCALIA, J., concurring in part and concurring in judgment). For purposes of exposition, we depart from a normal order of discussion, namely an order that first considers Zuni's statutory language argument. See *Barnhart* v. *Sigmon Coal Co.,* 534 U. S. 438, 450 (2002). Instead, because of the technical nature of the language in question, we shall first examine the provision's background and basic purposes. That discussion will illuminate our subsequent analysis in Part II–B, *infra.* It will also reveal why Zuni concentrates its argument upon language alone.

Considerations other than language provide us with unusually strong indications that Congress intended to leave the Secretary free to use the calculation method before us and that the Secretary's chosen method is a reasonable one. For one thing, the matter at issue—*i.e.*, the calculation method for determining whether a state aid program "equalizes expenditures"—is the kind of highly technical, specialized interstitial matter that Congress often does not decide itself, but delegates to specialized agencies to decide. See *United States* v. *Mead Corp.*, 533 U. S. 218, 234 (2001); cf. *MCI Telecommunications Corp.* v. *American Telephone & Telegraph Co.*, 512 U. S. 218, 231, (1994); *Christensen, supra*, at 589, n. (opinion of SCALIA, J.).

For another thing, the history of the statute strongly supports the Secretary. Congress first enacted an impact

aid "equalization" exception in 1974. The exception origi-
nally provided that the "ter[m] . . . 'equaliz[ing] expendi-
tures' . . . shall be defined by the [Secretary]." 20 U. S. C.
§240(d)(2)(B) (1970 ed., Supp. IV). Soon thereafter, in
1976, the Secretary promulgated the regulation here at
issue defining the term "equalizing expenditures" in the
manner now before us. See Part I–B, *supra.* As far as we
can tell, no Member of Congress has ever criticized the
method the 1976 regulation sets forth nor suggested at
any time that it be revised or reconsidered.

The present statutory language originated in draft
legislation that the Secretary himself sent to Congress in
1994. With one minor change (irrelevant to the present
calculation controversy), Congress adopted that language
without comment or clarification. No one at the time—no
Member of Congress, no Department of Education official,
no school district or State—expressed the view that this
statutory language (which, after all, was supplied by the
Secretary) was intended to require, or did require, the
Secretary to change the Department's system of calcula-
tion, a system that the Department and school districts
across the Nation had followed for nearly 20 years, with-
out (as far as we are told) any adverse effect.

Finally, viewed in terms of the purpose of the statute's
disregard instruction, the Secretary's calculation method
is reasonable, while the reasonableness of a method based
upon the number of districts alone (Zuni's proposed
method) is more doubtful. When the Secretary (then
Commissioner) of Education considered the matter in
1976, he explained why that is so.

Initially the Secretary pointed out that the "exclusion of
the upper and bottom 5 percentile school districts is based
upon the accepted principle of statistical evaluation that
such percentiles usually represent *unique* or *noncharacter-
istic* situations." 41 Fed. Reg. 26320 (1976) (emphasis
added). That purpose, a purpose to exclude statistical

outliers, is evident in the language of the present statute. The provision uses the technical term "percentile"; it refers to cutoff numbers ("95th" and "5th") often associated with scientific calculations; and it directly precedes another statutory provision that tells the Secretary to account for those districts, from among the middle 5th to 95th percentile districts, that remain "noncharacteristic" in respect to geography or the presence of special students (such as disabled students). See 20 U. S. C. §§7709(b)(2)(B)(i)–(ii).

The Secretary added that under the regulation's calculation system the "percentiles" would be "determined on the basis of numbers of pupils and not on the basis of numbers of districts." 41 Fed. Reg. 26324. He said that to base "an exclusion on numbers of districts" alone "would act to apply the disparity standard in an unfair and inconsistent manner among States." *Ibid.* He then elaborated upon his concerns:

> "The purpose of the exclusion is to eliminate those anomalous characteristics of a distribution of expenditures. In States with a small number of large districts, an exclusion based on percentage of school districts might exclude from the measure of disparity a substantial percentage of the pupil population in those States. Conversely, in States with large numbers of small districts, such an approach might exclude only an insignificant fraction of the pupil population and would not exclude anomalous characteristics." *Ibid.*

To understand the Secretary's first problem, consider an exaggerated example, say a State with 80 school districts of unequal size. Suppose 8 of the districts include urban areas and together account for 70 percent of the State's students, while the remaining 72 districts include primarily rural areas and together account for 30 percent of the

State's students.  If the State's greatest funding dispari-
ties are among the 8 urban districts, Zuni's calculation
method (which looks only at the number of districts and
ignores their size) would require the Secretary to disre-
gard the system's 8 largest districts (*i.e.*, 10 percent of the
number 80) even though those 8 districts (because they
together contain 70 percent of the State's pupils) are
typical of, indeed characterize, the State's public school
system.  It would require the Secretary instead to measure
the system's expenditure equality by looking only to non-
characteristic districts that are not representative of the
system as a whole, indeed districts accounting for only 30
percent of the State's pupils.  Thus, according to Zuni's
method, the Secretary would have to certify a state aid
program as one that "equalizes expenditures" even if there
were gross disparities in per-pupil expenditures among
urban districts accounting for 70 percent of the State's
students.  By way of contrast, the Secretary's method, by
taking into account a district's size as well as its expendi-
tures, would avoid a calculation that would produce re-
sults so contrary to the statute's objective.

To understand the Secretary's second problem consider
this very case.  New Mexico's 89 school districts vary
significantly in respect to the number of pupils each con-
tains.  Zuni's calculation system nonetheless forbids the
Secretary to discount more than 10 districts—10 percent
of the total number of districts (rounded up).  But these
districts taken together account for only 1.8 percent of the
State's pupils.  To eliminate only those districts, instead of
eliminating districts that together account for 10 percent
of the State's pupils, risks resting the "disregard" calcula-
tion upon a few particularly extreme noncharacteristic
districts, yet again contrary to the statute's intent.

Thus, the history and purpose of the disregard instruc-
tion indicate that the Secretary's calculation formula is a
reasonable method that carries out Congress' likely intent

in enacting the statutory provision before us.

### B

But what of the provision's literal language? The matter is important, for normally neither the legislative history nor the reasonableness of the Secretary's method would be determinative if the plain language of the statute unambiguously indicated that Congress sought to foreclose the Secretary's interpretation. And Zuni argues that the Secretary's formula could not possibly effectuate Congress' intent since the statute's language literally forbids the Secretary to use such a method. Under this Court's precedents, if the intent of Congress is clear and unambiguously expressed by the statutory language at issue, that would be the end of our analysis. See *Chevron*, 467 U. S., at 842–843. A customs statute that imposes a tariff on "clothing" does not impose a tariff on automobiles, no matter how strong the policy arguments for treating the two kinds of goods alike. But we disagree with Zuni's conclusion, for we believe that the Secretary's method falls within the scope of the statute's plain language.

That language says that, when the Secretary compares (for a specified fiscal year) "the amount of per-pupil expenditures made by" (1) the highest-per-pupil-expenditure district and (2) the lowest-per-pupil-expenditure district, "the Secretary shall . . . disregard" local school districts "with per-pupil expenditures . . . above the 95th percentile or below the 5th percentile of such expenditures in the State." 20 U. S. C. §7709(b)(2)(B)(i). The word "such" refers to "per-pupil expenditures" (or more precisely to "per-pupil expenditures" in the test year specified by the statute). The question then is whether the phrase "*above the 95th percentile . . . of . . . [per pupil] expenditures*" permits the Secretary to calculate percentiles by (1) ranking local districts, (2) noting the student population of each district, and (3) determining the cutoff point on the

basis of districts containing 95 percent (or 5 percent) of the State's students.

Our answer is that this phrase, taken with absolute literalness, limits the Secretary to calculation methods that involve "per-pupil expenditures." But it does not tell the Secretary which of several different possible methods the Department must use. Nor does it rule out the present formula, which distributes districts in accordance with per-pupil expenditures, while essentially weighting each district to reflect the number of pupils it contains.

Because the statute uses technical language (*e.g.*, "percentile") and seeks a technical purpose (eliminating uncharacteristic, or outlier, districts), we have examined dictionary definitions of the term "percentile." See 41 Fed. Reg. 26320 (Congress intended measurements based upon an "accepted principle of *statistical* evaluation" (emphasis added)). Those definitions make clear that "percentile" refers to a division of a distribution of *some* population into 100 parts. Thus, Webster's Third New International Dictionary 1675 (1961) (Webster's Third) defines "percentile" as "the value of the statistical variable that marks the boundary between any two consecutive intervals in a distribution of 100 intervals each containing one percent of the total population." A standard economics dictionary gives a similar definition for "percentiles":

> "The values separating hundredth parts of a distribution, arranged in order of size. The 99th percentile of the income distribution, for example, is the income level such that only one percent of the population have larger incomes." J. Black, A Dictionary of Economics 348–349 (2d ed. 2002).

A dictionary of mathematics states: "The *n*-th percentile is the value $x_{n/100}$ such that *n* per cent of the population is less than or equal to $x_{n/100}$." It adds that "[t]he terms can be modified, though not always very satisfactorily, to be

applicable to a discrete random variable or to a large sample ranked in ascending order." C. Clapham & J. Nicholson, The Concise Oxford Dictionary of Mathematics 378–379 (3d ed. 2005) (emphasis deleted). The American Heritage Science Dictionary 468 (2005) explains that a percentile is "[a]ny of the 100 equal parts into which the range of the values of a set of data can be divided in order to show the distribution of those values." And Merriam-Webster's Medical Desk Dictionary 612 (2002) describes percentile as "a value on a scale of one hundred that indicates the percent of a distribution that is equal to or below it."

These definitions, mainstream and technical, all indicate that, in order to identify the relevant percentile cutoffs, the Secretary must construct a distribution of values. That distribution will consist of a "population" ranked according to a characteristic. That characteristic takes on a "value" for each member of the relevant population. The statute's instruction to identify the 95th and 5th "percentile of such expenditures" makes clear that the relevant *characteristic* for ranking purposes is per-pupil expenditure during a particular year. But the statute does not specify precisely what *population* is to be "distributed" (*i.e.*, ranked according to the population's corresponding values for the relevant characteristic). Nor does it set forth various details as to how precisely the distribution is to be constructed (as long as it is ranked according to the specified characteristic).

But why is Congress' silence in respect to these matters significant? Are there several *different* populations, relevant here, that one might rank according to "per-pupil expenditures" (and thereby determine in several *different* ways a cutoff point such that "*n* percent of [that] population" falls, say below the percentile cutoff)? We are not experts in statistics, but a statistician is not needed to see what the dictionary does not say. No dictionary definition

we have found suggests that there is any *single* logical,
mathematical, or statistical link between, on the one
hand, the characterizing data (used for ranking purposes)
and, on the other hand, the nature of the relevant popula-
tion or how that population might be weighted for pur-
poses of determining a percentile cutoff.

Here, the Secretary has distributed districts, ranked
them according to per-pupil expenditure, but compared
only those that account for 90 percent of the State's pupils.
Thus, the Secretary has used—as his predecessors had
done for a quarter century before him—the State's *stu-
dents* as the relevant population for calculating the speci-
fied percentiles. Another Secretary might have distrib-
uted districts, ranked them by per-pupil expenditure, and
made no reference to the number of pupils (a method that
satisfies the statute's *language* but threatens the problems
the Secretary long ago identified, see 41 Fed. Reg. 26324;
*supra,* at 4–5). A third Secretary might have distributed
districts, ranked them by per-pupil expenditure, but com-
pared only those that account for 90 percent of total pupil
expenditures in the State. A fourth Secretary might have
distributed districts, ranked them by per-pupil expendi-
ture, but calculated the 95th and 5th percentile cutoffs
using the per-pupil expenditures of all the individual
*schools* in the State. See 41 Fed. Reg. 26324 (considering
this system of calculation). A fifth Secretary might have
distributed districts, ranked them by per-pupil expendi-
ture, but accounted in his disparity calculation for the
sometimes significant differences in per-pupil spending at
different grade levels. See 34 CFR §222.162(b)(1) (2006)
(authorizing such a system); *id.,* pt. 222, subpt. K, App.
See also Appendix B, *infra.*

Each of these methods amounts to a different way of
determining which districts fall between the 5th and 95th
"percentile of per-pupil expenditures." For purposes of
that calculation, they each adopt different populations—

students, districts, schools, and grade levels.  Yet, linguistically speaking, one may attribute the characteristic of per-pupil expenditure to each member of any such population (though the values of that characteristic may be more or less readily available depending on the chosen population, see 41 Fed. Reg. 26324).  Hence, the statute's literal language covers any or all of these methods.  That language alone does not tell us (or the Secretary of Education), however, which method to use.

JUSTICE SCALIA's claim that this interpretation "defies any semblance of normal English" depends upon its own definition of the word "per."  That word, according to the dissent, "connotes . . . a single average figure assigned to a unit the composite members of which are individual pupils."  *Post*, at 6 (dissenting opinion) (emphasis omitted).  In fact, the word "per" simply means "[f]or each" or "for every."  Black's Law Dictionary 1171 (8th ed. 1999); see Webster's Third 1674.  Thus, nothing in the English language forbids the Secretary from considering expenditures *for each* individual pupil in a district when instructed to look at a district's "per-pupil expenditures."  The remainder of the dissent's argument, colorful language to the side, rests upon a reading of the statutory language that ignores its basic purpose and history.

We find additional evidence for our understanding of the language in the fact that Congress, in other statutes, has clarified the matter here at issue thereby avoiding comparable ambiguity.  For example, in a different education-related statute, Congress refers to "the school at the 20th percentile in the State, *based on enrollment*, among all schools *ranked by the percentage of students at the proficient level*."  20 U. S. C. §6311(b)(2)(E)(ii) (2000 ed., Supp. IV) (emphasis added).  In another statute fixing charges for physicians services, Congress specified that the maximum charge "shall be the 50th percentile of the customary charges for the service *(weighted by the frequency of the*

*service)* performed by nonparticipating physicians in the locality during the [prior] 12-month period." 42 U. S. C. §1395u(j)(1)(C)(v) (2000 ed.) (emphasis added). In these statutes Congress indicated with greater specificity how a percentile should be determined by stating precisely not only which data values are of interest, but also (in the first) the population that is to be distributed and (in the second) the weightings needed to make the calculation meaningful and to avoid counterproductive results. In the statute at issue here, however, Congress used more general language (drafted by the Secretary himself), which leaves the Secretary with the authority to resolve such subsidiary matters at the administrative level.

We also find support for our view of the language in the more general circumstance that statutory "[a]mbiguity is a creature not [just] of definitional possibilities but [also] of statutory context." *Brown* v. *Gardner*, 513 U. S. 115, 118 (1994). See also *FDA* v. *Brown & Williamson Tobacco Corp.*, 529 U. S. 120, 132–133 (2000) ("[m]eaning—*or ambiguity*—of certain words or phrases may only become evident when placed in context" (emphasis added)). That may be so even if statutory language is highly technical. After all, the scope of what seems a precise technical chess instruction, such as "you must place the queen next to the king," varies with context, depending, for example, upon whether the instructor is telling a beginner how to set up the board or telling an advanced player how to checkmate an opponent. The dictionary acknowledges that, when interpreting technical statistical language, the purpose of the exercise matters, for it says that "quantile," "percentile," "quartile," and "decile" are "terms [that] can be modified, though not always very satisfactorily, to be applicable to . . . a large sample ranked in ascending order." Oxford Dictionary of Mathematics, at 379.

Thus, an instruction to "identify schools with average scholastic aptitude test scores below the 5th percentile of

such scores" may vary as to the population to be distributed, depending upon whether the context is one of providing additional counseling and support to *students* at low-performing schools (in which case the relevant population would likely consist of students), or one of identifying unsuccessful learning protocols at low-performing schools (in which case the appropriate population may well be the schools themselves). Context here tells us that the instruction to identify school districts with "per-pupil expenditures" above the 95th percentile "of such expenditures" is similarly ambiguous, because both students and school districts are of concern to the statute. Accordingly, the disregard instruction can include within its scope the distribution of a ranked population that consists of pupils (or of school districts weighted by pupils) and not just a ranked distribution of unweighted school districts alone.

Finally, we draw reassurance from the fact that no group of statisticians, nor any individual statistician, has told us directly in briefs, or indirectly through citation, that the language before us cannot be read as we have read it. This circumstance is significant, for the statutory language is technical, and we are not statisticians. And the views of experts (or their absence) might help us understand (though not control our determination of) what Congress had in mind.

The upshot is that the language of the statute is broad enough to permit the Secretary's reading. That fact requires us to look beyond the language to determine whether the Secretary's interpretation is a reasonable, hence permissible, implementation of the statute. See *Chevron*, 467 U. S., at 842–843. For the reasons set forth in Part II–A, *supra*, we conclude that the Secretary's reading is a reasonable reading. We consequently find the Secretary's method of calculation lawful.

The judgment of the Tenth Circuit is affirmed.

*It is so ordered.*

APPENDIXES TO OPINION OF THE COURT

A

We set out the relevant statutory provisions and accompanying regulations in full.  The reader will note that in the text of our opinion, for purposes of exposition, we use the term "local school districts" where the statute refers to "local educational agencies."  We also disregard the statute's frequent references to local "revenues" because those references do not raise any additional considerations germane to this case.

Impact Aid Program, 20 U. S. C. §7709 (2000 ed. and Supp. IV) (State consideration of payments in providing state aid):

"(a)  General prohibition

"Except as provided in subsection (b) of this section, a State may not—

"(1)  consider payments under this subchapter in determining for any fiscal year—

"(A) the eligibility of a local educational agency for State aid for free public education; or

"(B)  the amount of such aid; or

"(2)  make such aid available to local educational agencies in a manner that results in less State aid to any local educational agency that is eligible for such payment than such agency would receive if such agency were not so eligible.

"(b)  State equalization plans

"(1)  In general

"A State may reduce State aid to a local educa-

tional agency that receives a payment under section 7702 or 7703(b) of this title (except the amount calculated in excess of 1.0 under section 7703(a)(2)(B) of this title and, with respect to a local educational agency that receives a payment under section 7703(b)(2) of this title, the amount in excess of the amount that the agency would receive if the agency were deemed to be an agency eligible to receive a payment under section 7703(b)(1) of this title and not section 7703(b)(2) of this title) for any fiscal year if the Secretary determines, and certifies under subsection (c)(3)(A) of this section, that the State has in effect a program of State aid that equalizes expenditures for free public education among local educational agencies in the State.

"(2)  Computation

"(A)  In general

"For purposes of paragraph (1), a program of State aid equalizes expenditures among local educational agencies if, in the second fiscal year preceding the fiscal year for which the determination is made, the amount of per-pupil expenditures made by, or per-pupil revenues available to, the local educational agency in the State with the highest such per-pupil expenditures or revenues did not exceed the amount of such per-pupil expenditures made by, or per-pupil revenues available to, the local educational agency in the State with the lowest such expenditures or revenues by more than 25 percent.

"(B)  Other factors

In making a determination under this subsec-

tion, the Secretary shall—

> "(i) disregard local educational agencies with per-pupil expenditures or revenues above the 95th percentile or below the 5th percentile of such expenditures or revenues in the State; and

> "(ii) take into account the extent to which a program of State aid reflects the additional cost of providing free public education in particular types of local educational agencies, such as those that are geographically isolated, or to particular types of students, such as children with disabilities."

## B

34 CFR §222.162 (2006) (What disparity standard must a State meet in order to be certified and how are disparities in current expenditures or revenues per pupil measured?):

> "(a) *Percentage disparity limitation.* The Secretary considers that a State aid program equalizes expenditures if the disparity in the amount of current expenditures or revenues per pupil for free public education among LEAs in the State is no more than 25 percent. In determining the disparity percentage, the Secretary disregards LEAs with per pupil expenditures or revenues above the 95th or below the 5th percentile of those expenditures or revenues in the State. The method for calculating the percentage of disparity in a State is in the appendix to this subpart.

> "(b)(1) *Weighted average disparity for different grade level groups.* If a State requests it, the Secretary will make separate disparity computations for different groups of LEAs in the State that have similar grade levels of instruction.

"(2) In those cases, the weighted average disparity for all groups, based on the proportionate number of pupils in each group, may not be more than the percentage provided in paragraph (a) of this section. The method for calculating the weighted average disparity percentage is set out in the appendix to this subpart.

"(c) *Per pupil figure computations.* In calculating the current expenditures or revenue disparities under this section, computations of per pupil figures are made on one of the following bases:

"(1) The per pupil amount of current expenditures or revenue for an LEA is computed on the basis of the total number of pupils receiving free public education in the schools of the agency. The total number of pupils is determined in accordance with whatever standard measurement of pupil count is used in the State."

34 CFR pt. 222, subpt. K, App. (2006) (Methods of Calculations for Treatment of Impact Aid Payments Under State Equalization Programs):

"The following paragraphs describe the methods for making certain calculations in conjunction with determinations made under the regulations in this subpart. Except as otherwise provided in the regulations, these methods are the only methods that may be used in making these calculations.

"1. *Determinations of disparity standard compliance under § 222.162(b)(1).*

"(a) The determinations of disparity in current expenditures or revenue per pupil are made by—

"(i) Ranking all LEAs having similar grade levels within the State on the basis of current expenditures or revenue per pupil for the second preceding fiscal

year before the year of determination;

"(ii) Identifying those LEAs in each ranking that fall at the 95th and 5th percentiles of the total number of pupils in attendance in the schools of those LEAs; and

"(iii) Subtracting the lower current expenditure or revenue per pupil figure from the higher for those agencies identified in paragraph (ii) and dividing the difference by the lower figure.

.     .     .     .     .

"(b) In cases under §222.162(b), where separate computations are made for different groups of LEAs, the disparity percentage for each group is obtained in the manner described in paragraph (a) above. Then the weighted average disparity percentage for the State as a whole is determined by—

"(i) Multiplying the disparity percentage for each group by the total number of pupils receiving free public education in the schools in that group;

"(ii) Summing the figures obtained in paragraph (b)(i); and

"(iii) Dividing the sum obtained in paragraph (b)(ii) by the total number of pupils for all the groups.

### EXAMPLE

Group 1 (grades 1–6), 80,000 pupils x 18%     = 14,400
Group 2 (grades 7–12), 100,000 pupils x 22% = 22,000
Group 3 (grades 1–12), 20,000 pupils x 35%   =  7,000

  Total 200,000 pupils ...................................... 43,400
  43,400/200,000=21.70% Disparity
                                                                                      "

# SUPREME COURT OF THE UNITED STATES

———————

No. 05–1508

———————

## ZUNI PUBLIC SCHOOL DISTRICT NO. 89, ET AL., PETITIONERS *v.* DEPARTMENT OF EDUCATION ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE TENTH CIRCUIT

[April 17, 2007]

JUSTICE STEVENS, concurring.

In his oft-cited opinion for the Court in *Griffin* v. *Oceanic Contractors, Inc.*, 458 U. S. 564, 571 (1982), then-Justice Rehnquist wisely acknowledged that "in rare cases the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters, and those intentions must be controlling." And in *United States* v. *Ron Pair Enterprises, Inc.*, 489 U. S. 235, 242 (1989), the Court began its analysis of the question of statutory construction by restating the proposition that "[i]n such cases, the intention of the drafters, rather than the strict language, controls." JUSTICE SCALIA provided the decisive fifth vote for the majority in that case.

Today he correctly observes that a judicial decision that departs from statutory text may represent "policy-driven interpretation." *Post*, at 3 (dissenting opinion). As long as that driving policy is faithful to the intent of Congress (or, as in this case, aims only to give effect to such intent)—which it must be if it is to override a strict interpretation of the text—the decision is also a correct performance of the judicial function. JUSTICE SCALIA's argument today rests on the incorrect premise that every policy-driven interpretation implements a judge's personal view of sound policy, rather than a faithful attempt to carry out

the will of the legislature. Quite the contrary is true of the
work of the judges with whom I have worked for many
years. If we presume that our judges are intellectually
honest—as I do—there is no reason to fear "policy-driven
interpretation[s]" of Acts of Congress.

In *Chevron U. S. A. Inc.* v. *Natural Resources Defense
Council, Inc.,* 467 U. S. 837, 842 (1984), we acknowledged
that when "the intent of Congress is clear [from the statu-
tory text], that is the end of the matter." But we also
made quite clear that "administrative constructions which
are contrary to clear congressional intent" must be re-
jected. *Id.*, at 843, n. 9. In that unanimous opinion, we
explained:

> "If a court, employing traditional tools of statutory
> construction, ascertains that Congress had an inten-
> tion on the precise question at issue, that intention is
> the law and must be given effect." *Ibid.*

Analysis of legislative history is, of course, a traditional
tool of statutory construction.[1] There is no reason why we
must confine ourselves to, or begin our analysis with, the
statutory text if other tools of statutory construction pro-
vide better evidence of congressional intent with respect to
the precise point at issue.

As the Court's opinion demonstrates, this is a quintes-
sential example of a case in which the statutory text was
obviously enacted to adopt the rule that the Secretary
administered both before and after the enactment of the
rather confusing language found in 20 U. S. C.
§7709(b)(2)(B)(i). See *ante*, at 7–8. That text is suffi-
ciently ambiguous to justify the Court's exegesis, but my
own vote is the product of a more direct route to the
Court's patently correct conclusion. This happens to be a

---

[1] See, *e.g.*, *Wisconsin Public Intervenor* v. *Mortier,* 501 U. S. 597, 610,
n. 4 (1991); *Steelworkers* v. *Weber,* 443 U. S. 193, 230–253 (1979)
(Rehnquist, J., dissenting).

case in which the legislative history is pellucidly clear and the statutory text is difficult to fathom.[2]  Moreover, it is a case in which I cannot imagine anyone accusing any Member of the Court of voting one way or the other because of that Justice's own policy preferences.

Given the clarity of the evidence of Congress' "intention on the precise question at issue," I would affirm the judgment of the Court of Appeals even if I thought that petitioners' literal reading of the statutory text was correct.[3] The only "policy" by which I have been driven is that which this Court has endorsed on repeated occasions regarding the importance of remaining faithful to Congress' intent.

---

[2] Contrary to JUSTICE SCALIA, I find it far more likely that the Congress that voted "without comment or clarification," *ante*, at 8 (majority opinion), to adopt the 1994 statutory language relied on the endorsement of its sponsors, who introduced the legislation "on behalf of the administration," see 139 Cong. Rec. 23416 (1993) (remarks of Sen. Kennedy) and *id.*, at 23514 (remarks of Sen. Jeffords), and the fact that such language was drafted and proposed by the U. S. Department of Education, rather than a parsing of its obscure statutory text.

Moreover, I assume that, regardless of the statutory language's supposed clarity, any competent counsel challenging the validity of a presumptively valid federal regulation would examine the legislative history of its authorizing statute before filing suit.

[3] See *Church of Holy Trinity* v. *United States*, 143 U. S. 457, 459 (1892) ("It is a familiar rule, that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers").

# SUPREME COURT OF THE UNITED STATES

_____

No. 05–1508

_____

## ZUNI PUBLIC SCHOOL DISTRICT NO. 89, ET AL., PETITIONERS *v.* DEPARTMENT OF EDUCA-TION ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

[April 17, 2007]

JUSTICE KENNEDY, with whom JUSTICE ALITO joins, concurring.

The district courts and courts of appeals, as well as this Court, should follow the framework set forth in *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984), even when departure from that framework might serve purposes of exposition. When considering an administrative agency's interpretation of a statute, a court first determines "whether Congress has directly spoken to the precise question at issue." *Id.,* at 842. If so, "that is the end of the matter." *Ibid.* Only if "Congress has not directly addressed the precise question at issue" should a court consider "whether the agency's answer is based on a permissible construction of the statute." *Id.,* at 843.

In this case, the Court is correct to find that the plain language of the statute is ambiguous. It is proper, therefore, to invoke *Chevron*'s rule of deference. The opinion of the Court, however, inverts *Chevron*'s logical progression. Were the inversion to become systemic, it would create the impression that agency policy concerns, rather than the traditional tools of statutory construction, are shaping the judicial interpretation of statutes. It is our obligation to set a good example; and so, in my view, it would have been

preferable, and more faithful to *Chevron*, to arrange the opinion differently.  Still, we must give deference to the author of an opinion in matters of exposition; and because the point does not affect the outcome, I join the Court's opinion.

# SUPREME COURT OF THE UNITED STATES

———————

No. 05–1508

———————

## ZUNI PUBLIC SCHOOL DISTRICT NO. 89, ET AL., PETITIONERS *v.* DEPARTMENT OF EDUCA-TION ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

[April 17, 2007]

JUSTICE SCALIA, with whom THE CHIEF JUSTICE and JUSTICE THOMAS join, and with whom JUSTICE SOUTER joins as to Part I, dissenting.

In *Church of the Holy Trinity* v. *United States*, 143 U. S. 457 (1892), this Court conceded that a church's act of contracting with a prospective rector fell within the plain meaning of a federal labor statute, but nevertheless did not apply the statute to the church: "It is a familiar rule," the Court pronounced, "that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers." *Id.,* at 459.  That is a judge-empowering proposition if there ever was one, and in the century since, the Court has wisely retreated from it, in words if not always in actions.  But today *Church of the Holy Trinity* arises, Phoenix-like, from the ashes.  The Court's contrary assertions aside, today's decision is nothing other than the elevation of judge-supposed legislative intent over clear statutory text.  The plain language of the federal Impact Aid statute clearly and unambiguously forecloses the Secretary of Education's preferred methodology for determining whether a State's school-funding system is equalized.  Her selection of that methodology is therefore entitled to zero deference under *Chevron  U. S. A.  Inc.*  v.

*Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984).

I

The very structure of the Court's opinion provides an obvious clue as to what is afoot. The opinion purports to place a premium on the plain text of the Impact Aid statute, *ante*, at 11, but it first takes us instead on a roundabout tour of "[c]onsiderations *other* than language," *ante*, at 7 (emphasis added)—page after page of unenacted congressional intent and judicially perceived statutory purpose, Part II–A, *ante*. Only after we are shown "why Zuni concentrates its argument upon language alone," *ante,* at 7 (impliedly a shameful practice, or at least indication of a feeble case), are we informed how the statute's plain text does not unambiguously *preclude* the interpretation the Court thinks best. Part II–B, *ante* (beginning "But what of the provision's literal language? The matter is important . . . "). This is a most suspicious order of proceeding, since our case law is full of statements such as "We begin, as always, with the language of the statute," *Duncan* v. *Walker*, 533 U. S. 167, 172 (2001), and replete with the affirmation that, when "[g]iven [a] straightforward statutory command, there is no reason to resort to legislative history," *United States* v. *Gonzales*, 520 U. S. 1, 6 (1997). Nor is this cart-before-the-horse approach justified by the Court's excuse that the statute before us is, after all, a technical one, *ante*, at 7. This Court, charged with interpreting, among other things, the Internal Revenue Code, the Employee Retirement Income Security Act of 1974, and the Clean Air Act, confronts technical language all the time, but we never see fit to pronounce upon what we think Congress *meant* a statute to say, and what we think sound policy would *counsel* it to say, before considering what it *does* say. As almost a majority of today's majority worries, "[w]ere the inversion [of inquiry] to

become systemic, it would create the impression that agency policy concerns, rather than the traditional tools of statutory construction, are shaping the judicial interpretation of statutes." *Ante*, at 1 (KENNEDY, J., joined by ALITO, J., concurring). True enough—except I see no reason to wait for the distortion to become systemic before concluding that that is precisely what is happening in the present case. For some, policy-driven interpretation is apparently just fine. See *ante*, at 1–2 (STEVENS, J., concurring). But for everyone else, let us return to Statutory Interpretation 101.

We must begin, as we always do, with the text. See, *e.g.*, *Gonzales, supra*, at 4. Under the federal Impact Aid program, 20 U. S. C. §7701 *et seq.* (2000 ed. and Supp. IV), States distributing state aid to local school districts (referred to in the statute as "local educational agencies," or "LEAs"[1]) may not take into account the amount of federal Impact Aid that its LEAs receive. See §7709(a). But the statute makes an exception if the Secretary of Education certifies that a State "has in effect a program of State aid that equalizes expenditures for free public education among local educational agencies in the State." §7709(b)(1) (2000 ed., Supp. IV). Congress has specified a formula for the Secretary to use when making this equalization determination:

> "[A] program of State aid equalizes expenditures among local educational agencies if . . . the amount of per-pupil expenditures made by, or per-pupil revenues available to, the local educational agency in the State with the highest such per-pupil expenditures or revenues did not exceed the amount of such per-pupil ex-

---

[1] The Court's opinion has replaced the phrase "'local educational agencies'" with "'local school districts.'" See *ante*, at 19. While I have no objection to that terminology, I will instead use "local educational agencies" and "LEAs."

penditures made by, or per-pupil revenues available
to, the local educational agency in the State with the
lowest such expenditures or revenues by more than 25
percent." §7709(b)(2)(A).

The Secretary is further instructed, however, that when
making this determination, she shall "disregard local
educational agencies with per-pupil expenditures or reve-
nues above the 95th percentile or below the 5th percentile
of such expenditures or revenues in the State."
§7709(b)(2)(B)(i). It is this latter subsection which con-
cerns us here.

The casual observer will notice that the Secretary's
implementing regulations do not look much like the stat-
ute. The regulations first require the Secretary to rank all
of the LEAs in a State (New Mexico has 89) according to
their per-pupil expenditures or revenues. 34 CFR pt. 222,
subpt. K, App. ¶(1)(a)(i) (2006). So far so good. But criti-
cally here, the Secretary must then "[i]dentif[y] those
LEAs . . . that fall at the 95th and 5th percentiles *of the
total number of pupils in attendance* in the schools of those
LEAs." *Id.,* ¶(1)(a)(ii) (emphasis added). Finally, the
Secretary compares the per-pupil figures of *those two*
LEAs for the purpose of assessing whether a State exceeds
the 25% disparity measure. *Id.,* ¶(1)(a)(iii). The majority
concludes that this method of calculation, with its focus on
student population, is a permissible interpretation of the
statute.

It most assuredly is not. To understand why, one first
must look beyond the smokescreen that the Court lays
down with its repeated apologies for inexperience in sta-
tistics, and its endless recitation of technical mathematical
definitions of the word "percentile." See, *e.g., ante,* at 12–
13 ("'The *n*-th percentile is the value $x_{n/100}$ such that *n* per
cent of the population is less than or equal to $x_{n/100}$.'" (quot-
ing C. Clapham & J. Nicholson, The Concise Oxford Dic-

tionary of Mathematics 378 (3d ed. 2005))). This case is not a scary math problem; it is a straightforward matter of statutory interpretation. And we do not need the Court's hypothetical cadre of number-crunching *amici*, *ante*, at 17, to guide our way.

There is no dispute that for purposes relevant here "'percentile' refers to a division of a distribution of *some* population into 100 parts.'" *Ante*, at 12. And there is further no dispute that the statute concerns the percentile of "per-pupil expenditures or revenues," for that is what the word "such" refers to. See 20 U. S. C. §7709(b)(2)(B)(i) (Secretary shall "disregard local educational agencies with *per-pupil expenditures or revenues* above the 95th percentile or below the 5th percentile of *such* expenditures or revenues in the State" (emphasis added)). The question is: Whose per-pupil expenditures or revenues? Or, in the Court's terminology, what "population" is assigned the "characteristic" "per-pupil expenditure or revenue"? *Ante*, at 13. At first blush, second blush, or twenty-second blush, the answer is abundantly clear: local educational agencies. The statute requires the Secretary to "disregard local educational agencies with" certain per-pupil figures above or below specified percentiles of those per-pupil figures. §7709(b)(2)(B)(i). The attribute "per-pupil expenditur[e] or revenu[e]" is assigned to LEAs—there is no mention of student population whatsoever. And thus under the statute, "per-pupil expenditures or revenues" are to be arrayed using a population consisting of LEAs, so that percentiles are determined from a list of (in New Mexico) 89 per-pupil expenditures or revenues representing the 89 LEAs in the State. It is just that simple.

The Court makes little effort to defend the regulations as they are written. Instead, relying on a made-for-litigation theory that bears almost no relationship to the regulations themselves, the Court believes it has found a way to shoehorn those regulations into the statute. The

Impact Aid statute is ambiguous, the Court says, because it "does not specify precisely what *population* is to be 'distributed' (*i.e.*, ranked according to the population's corresponding values for the relevant characteristic)." *Ante*, at 13. Thus the Court finds that it is permissible for the Secretary to attribute the characteristic "per-pupil expenditure or revenue" to pupils, with the result that the Secretary may "us[e] . . . the State's *students* as the relevant population for calculating the specified percentiles." *Ante,* at 14. Under that interpretation, as the State manages to explain with a straight face, "[i]n New Mexico, during the time at issue, there were approximately 317,777 pupils in the [S]tate and thus there were 317,777 per-pupil revenues in the [S]tate." Brief for Respondent New Mexico Public Education Department 37; see also *id.,* at 36 ("Each and every student in an LEA and in a [S]tate may be treated as having his or her own 'per-pupil' expenditure or revenue amount"). The Court consequently concludes that "linguistically speaking, one may attribute the characteristic of per-pupil expenditure to each [student]." *Ante*, at 15.

The sheer applesauce of this statutory interpretation should be obvious. It is of course true that every student in New Mexico causes an expenditure or produces a revenue that his LEA either enjoys (in the case of revenues) or is responsible for (in the case of expenditures). But it simply defies any semblance of normal English usage to say that every pupil has a "*per-pupil* expenditure or revenue." The word "per" *connotes* that the expenditure or revenue is a single average figure assigned to a unit the *composite members of which* are individual pupils. And the only such unit mentioned in the statute is the local educational agency.[2] See 20 U. S. C. §7709(b)(2)(B)(i). It

_____

[2] The Court maintains that the phrase "per-pupil expenditures or revenues" may also be attributed to schools or grade levels. *Ante*, at 14.

is simply irrelevant that "[n]o dictionary definition . . . suggests that there is any *single* logical, mathematical, or statistical link between [per-pupil expenditures or revenues] and . . . the nature of the relevant population." *Ante*, at 13–14. Of course there is not. It is the *text* at issue which must identify the relevant population, and it does so here quite unambiguously: "*local educational agencies with per-pupil expenditures or revenues.*" §7709(b)(2)(B)(i) (emphasis added). That same phrase shows the utter irrelevance of the Court's excursus upon the meaning of the word "per." See *ante*, at 15. It does indeed mean "'for each' or 'for every'"—and when it is contained in a clause that reads "local educational agencies with per-pupil expenditures or revenues" it refers to (and can only refer to) the average expenditure or revenue "for each" or "for every" student out of the total expenditures or revenues of the LEA.

The violence done to this statute would be severe enough if the Secretary *used* the actual expenditure or revenue for each individual pupil. But in fact the Secretary determines the per-pupil expenditure or revenue for each individual student by (guess what) *computing the per-pupil expenditure or revenue of each LEA!* As the New Mexico brief explains:

> "[A] per-pupil expenditure or revenue is an average number. It is not the amount actually spent on any given pupil, an amount which would be impossible to calculate in any meaningful way. It is roughly the total amount expended by an LEA divided by the num-

---

Standing alone and abstracted from the rest of the statute, indeed it may. But not when it appears in the phrase "*local educational agencies* with *per-pupil expenditures or revenues.*" (Emphasis added.) In any case, the fact that "per-pupil expenditures or revenues" *could* be applied to composite entities other than LEAs does not establish that speaking of the "per-pupil expenditure or revenue" of an individual student makes any sense (it does not).

ber of pupils in that LEA." Brief for Respondent New
Mexico Public Education Department 36.

The Secretary thus assigns an artificial number to each
student that corresponds exactly to *his LEA's* per-pupil
expenditure or revenue. In other words, at the end of the
day the Secretary herself acknowledges that "per-pupil
expenditures or revenues" pertains to LEAs, and not
students. And she is interpreting "per-pupil expenditure
or revenue" *not* as the Court suggests (an amount attrib-
utable to each student), but rather *as I suggest* (an aver-
age amount for the pupils in a particular LEA). But she
then proceeds to take a step not at all permitted by the
statutory formula—in effect applying "per-pupil expendi-
ture or revenue" a *second* time (this time according to the
Court's fanciful interpretation of "per-pupil") in order to
reach the result she desires. Of course, if the Secretary
did apply the "per-pupil expenditure or revenue" only
once, arraying students by their actual expenditures or
revenues, her entire system would collapse. Students
from the same LEA, rather than appearing on the list with
the same per-pupil figure, would be located at various
points on the spectrum. And so long as an LEA had at
least one student above the 95th or below the 5th percen-
tile of pupil "per-pupil expenditures or revenues," that
LEA would have to be excluded from the disparity analy-
sis. The result would be a serious distortion of the dispar-
ity determination, excluding many more LEAs (in fact,
perhaps all of them) from the disparity calculation. This
would render the 25% disparity measure in §7709(b)(2)(A)
all but meaningless.

The Court makes one final attempt to rescue the Secre-
tary's interpretation, appealing to "statutory context."
"Context here tells us," it says, "that the instruction to
identify school districts with 'per-pupil expenditures'
above the 95th percentile 'of such expenditures' is . . .

ambiguous, because both students and school districts are of concern to the statute." *Ante*, at 17. This is a complete non sequitur. Of course students are a concern to a statute dealing with school funding. But that does not create any ambiguity with respect to whether, under this statute, pupils can reasonably be said to have their own "per-pupil expenditures or revenues." It is simply irrational to say that the clear dispositions of a statute with regard to the entities that it regulates (here LEAs) are rendered ambiguous when those entities contain sub-units that are the ultimate beneficiaries of the regulation (here students). Such a principle of interpretation—if it could be called that—would inject ambiguity into many statutes indeed.

The Court's reliance on statutory context is all the more puzzling since the context obviously favors petitioners. "The focus [of the Impact Aid statute] is upon LEAs, not upon the number of pupils." 393 F. 3d 1158, 1172 (CA10 2004) (O'Brien, J., dissenting), opinion vacated, 437 F. 3d 1289, 1290 (2006) (en banc) *(per curiam)*. In fact, the provisions at issue here make not the slightest mention of students. That is both sensible and predictable, since the Impact Aid program's equalization formula is designed to address funding disparities between *LEAs*, not between *students*. See 20 U. S. C. §7709(b)(2)(A) (referring to "a program of State aid [that] equalizes expenditures among local educational agencies"); see also §7709(d)(1). Indeed, the whole point of the equalization determination is to figure out whether States may reduce state aid to *LEAs*. See §7709(a).

In sum, the plain language of the Impact Aid statute compels the conclusion that the Secretary's method of calculation is ultra vires. Employing the formula that the statute requires, New Mexico is not equalized. *Ante*, at 6.

## II

How then, if the text is so clear, are respondents manag-

ing to win this case?  The answer can only be the return of
that miraculous redeemer of lost causes, *Church of the
Holy Trinity*.  In order to contort the statute's language
beyond recognition, the Court must believe Congress's
intent so crystalline, the spirit of its legislation so glow-
ingly bright, that the statutory text should simply not be
read to say what it says.  See Part II–A, *ante.*  JUSTICE
STEVENS is quite candid on the point: He is willing to
contradict the text.  See *ante*, at 2–3 (concurring opinion).[3]
But JUSTICE STEVENS' candor should not make his phi-
losophy seem unassuming.  He maintains that it is "a
correct performance of the judicial function" to "override a
strict interpretation of the text" so long as policy-driven
interpretation "is faithful to the intent of Congress."  *Ante*,
at 1.  But once one departs from "strict interpretation of
the text" (by which JUSTICE STEVENS means the actual
meaning of the text) fidelity to the intent of Congress is a
chancy thing.  The only thing we know for certain both
Houses of Congress (and the President, if he signed the
legislation) agreed upon is the text.  Legislative history
can never produce a "pellucidly clear" picture, *ante,* at 3
(STEVENS, J., concurring), of what a law was "intended" to
mean, for the simple reason that it is never voted upon—
or ordinarily even seen or heard—by the "intending" law-
giving entity, which consists of both Houses of Congress

——————

[3] Like JUSTICE STEVENS, respondents themselves were aboveboard
when they litigated this case at the administrative level.  After hearing
argument from the Department of Education, the Administrative Law
Judge (ALJ) protested: "The problem is I don't see the ambiguity of the
statute."  App. 29.  To this the Department's counsel responded: "The
only way I can do that is by reference to the statutory purpose."  *Ibid.*
Later in the hearing, the ALJ similarly asked the State of New Mexico
how its interpretation was consistent with the statute.  The State
answered: "Literally, on the face of the words, perhaps not, probably
not."  *Id.,* at 53.  Despite his misgivings, the ALJ ultimately decided
that he did not possess the authority to invalidate the regulations.
App. to Pet. for Cert. 38a, 51a.

and the President (if he did not veto the bill). See U. S. Const., Art. I, §§1, 7. Thus, what judges believe Congress "meant" (apart from the text) has a disturbing but entirely unsurprising tendency to be whatever judges think Congress *must* have meant, *i.e., should* have meant. In *Church of the Holy Trinity*, every Justice on this Court disregarded the plain language of a statute that forbade the hiring of a clergyman from abroad because, after all (they thought), "this is a Christian nation," 143 U. S., at 471, so Congress could not have meant what it said. Is there any reason to believe that those Justices were lacking that "intellectua[l] honest[y]" that JUSTICE STEVENS "presume[s]" all our judges possess, *ante*, at 2? Intellectual honesty does not exclude a blinding intellectual bias. And even if it did, the system of judicial amendatory veto over texts duly adopted by Congress bears no resemblance to the system of lawmaking set forth in our Constitution.

JUSTICE STEVENS takes comfort in the fact that this is a case in which he "cannot imagine anyone accusing any Member of the Court of voting one way or the other because of that Justice's own policy preferences." *Ante*, at 3. I can readily imagine it, given that the Court's opinion begins with a lengthy description of why the system its judgment approves is the *better* one. But even assuming that, in this rare case, the Justices' departure from the enacted law has nothing to do with their policy view that it is a bad law, nothing in JUSTICE STEVENS' separate opinion limits his approach to such rarities. Why should we suppose that in matters more likely to arouse the judicial libido—voting rights, antidiscrimination laws, or environmental protection, to name only a few—a judge in the School of Textual Subversion would not find it convenient (yea, *righteous!*) to assume that Congress *must* have meant, not what it said, but what he knows to be best?

Lest there be any confusion on the point, I must discuss briefly the two cases JUSTICE STEVENS puts forward, *ante,*

at 1, as demonstrating this Court's recent endorsement of
his unorthodox views. They demonstrate just the oppo-
site. *Griffin* v. *Oceanic Contractors, Inc.*, 458 U. S. 564
(1982), involved a maritime statute that required the
master of a vessel to furnish unpaid wages to a seaman
within a specified period after the seaman's discharge, and
further provided that a master who failed to do so without
sufficient cause "'shall pay to the seaman a sum equal to
two days' pay for each and every day during which pay-
ment is delayed.'" *Id.,* at 570 (quoting 46 U. S. C. §596
(1976 ed.)). We explained that "Congress intended the
statute to mean exactly what its plain language says," 458
U. S., at 574, and held that the seaman was entitled to
double wages for every day during which payment was
delayed, even for the period in which he had obtained
alternative employment. The result was that the seaman
would receive approximately $300,000 for his master's
improper withholding of $412.50, *id.,* at 575, even though
"[i]t [was] probably true that Congress did not precisely
envision the grossness of the difference . . . between the
actual wages withheld and the amount of the award re-
quired by the statute," *id.*, at 576. We suggested in dicta
that there might be a "rare cas[e]" in which the Court
could relax its steadfastness to statutory text, *id.*, at 571,
but if *Griffin* itself did not qualify, it is hard to imagine
what would. The principle JUSTICE STEVENS would as-
cribe to *Griffin* is in fact the one he advocated in dissent.
"[T]his is one of the cases in which the exercise of judg-
ment dictates a departure from the literal text in order to
be faithful to the legislative will." *Id.,* at 586 (STEVENS, J.,
dissenting).

The second case JUSTICE STEVENS relies upon, *United
States* v. *Ron Pair Enterprises, Inc.*, 489 U. S. 235 (1989),
is equally inapt. The Court's opinion there (unlike the one
here) explained that our analysis "must begin . . . with the
language of the statute itself," and concluded that that

was "also where the inquiry should end, for where . . . the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'" *Id.*, at 241 (quoting *Caminetti* v. *United States*, 242 U. S. 470, 485 (1917)). My "fifth vote" in *Ron Pair* was thus only "decisive," *ante*, at 1 (STEVENS, J., concurring), in reaffirming this Court's adherence to statutory text, decisively preventing it from falling off the precipice it plunges over today.

Contrary to the Court and JUSTICE STEVENS, I do not believe that what we are sure the Legislature *meant* to say can trump what it *did* say. Citizens arrange their affairs not on the basis of their legislators' unexpressed intent, but on the basis of the law as it is written and promulgated. I think it terribly unfair to expect that the two rural school districts who are petitioners here should have pored over some 30 years of regulatory history to divine Congress's "real" objective (and with it the "real" intent that a majority of Justices would find honest and true). To be governed by legislated text rather than legislators' intentions is what it means to be "a Government of laws, not of men." And in the last analysis the opposite approach is no more beneficial to the governors than it is to the governed. By "depriving legislators of the assurance that ordinary terms, used in an ordinary context, will be given a predictable meaning," we deprive Congress of "a sure means by which it may work the people's will." *Chisom* v. *Roemer*, 501 U. S. 380, 417 (1991) (SCALIA, J., dissenting).

I do not purport to know what Congress thought it was doing when it amended the Impact Aid program in 1994. But even indulging JUSTICE STEVENS' erroneous premise that there exists a "legislative intent" separate and apart from the statutory text, *ante*, at 1 (concurring opinion), I do not see how the Court can possibly say, with any measure of confidence, that Congress wished one thing rather than another. There is ample evidence, for example, that

at the time it amended the Impact Aid statute, Congress knew exactly how to incorporate student population into a disparity calculation. Most prominently, in the *very same* Act that added §7709(b)(2)(B)(i) to the Impact Aid program, Congress established the Education Finance Incentive Program, known as EFIG. See Improving America's Schools Act of 1994, 108 Stat. 3575. That statute allocates grants to States based in part on an "equity factor" which requires a disparity calculation similar to that in the Impact Aid statute. See 20 U. S. C. §6337(b)(1)(A) (2000 ed., Supp. IV). In EFIG, however, Congress specifically required the Secretary to take student population into account: "[T]he Secretary shall weigh the variation between per-pupil expenditures in each local educational agency . . . *according to the number of pupils served by the local educational agency*." §6337(b)(3)(A)(ii)(II) (emphasis added); see also Brief for Federal Respondent 28–29. And there is more. In EFIG, Congress *expressly provided* that a State would be accorded a favorable "equity factor" rating if it was considered equalized under the Secretary's *Impact Aid regulations*. See §6337(b)(3)(B) (2000 ed., Supp. IV). Congress thus explicitly incorporated the Impact Aid regulations into EFIG, but did no such thing with respect to the Impact Aid statute itself. All this on the very same day.

Nor do I see any significance in the fact that no legislator in 1994 expressed the view that §7709(b)(2)(B)(i) was designed to upend the Secretary's equalization formula. *Ante*, at 8 (majority opinion). It is quite plausible—indeed, eminently plausible—that the Members of Congress took the plain meaning of the language *which the Secretary himself had proposed* to be what the Secretary himself had previously been doing. It is bad enough for this Court to consider legislative materials beyond the statutory text in aid of resolving ambiguity, but it is truly unreasonable to *require* such extratextual evidence as a precondition for

enforcing an *unambiguous* congressional mandate. See *Koons Buick Pontiac GMC, Inc.* v. *Nigh*, 543 U. S. 50, 73–74 (2004) (SCALIA, J., dissenting). The Court points to the fact that "no Member of Congress has ever criticized the method the [Secretary's] regulation[s] sets forth." *Ante*, at 8. But can it really be that this case turns, in the Court's view, on whether a freshman Congressman from New Mexico gave a floor speech that only late-night C–SPAN junkies would witness? The only fair inference from Congress's silence is that Congress had nothing further to say, its statutory text doing all of the talking.

Finally, the Court expresses its belief that Congress must have intended to adopt the Secretary's pre-1994 disparity test because that test is the more reasonable one, better able to account for States with small numbers of large LEAs, or large numbers of small ones. See *ante*, at 8–11. This, to tell the truth, is the core of the opinion. As I have suggested, it is no accident that the countertextual legislative intent judges perceive *invariably* accords with what judges think best. It seems to me, however, that this Court is no more capable of saying with certainty what is best in this area than it is of saying with certainty (apart from the text) what Congress intended. There is good reason to be concerned—in the implementation of a statute that makes a limited exception for States that have "in effect a program of State aid that equalizes expenditures for free public education *among local educational agencies*," 20 U. S. C. §7709(b)(1) (2000 ed., Supp. IV) (emphasis added)—that the Secretary's methodology eliminates from the disparity calculation *too many LEAs*. In the certification at issue in this very case, the Secretary excluded 23 of New Mexico's 89 LEAs, approximately 26%. Is this Court such an expert in school finance that it can affirm the desirability of excluding one in four of New Mexico's LEAs from consideration?

As for the Secretary's concerns about the discrepancy

between large and small LEAs, does the Court have any basis for its apparent confidence that other parts of the Impact Aid statute do not adequately address the problem?  Immediately after setting forth the 95th and 5th percentile cutoffs, §7709(b)(2)(B)(i), the statute instructs the Secretary to "take into account the extent to which a program of State aid reflects the additional cost of providing free public education in particular types of local educational agencies, such as those that are geographically isolated, or to particular types of students, such as children with disabilities." §7709(b)(2)(B)(ii).  Respondents do not explain why the Secretary could not use §7709(b)(2)(B)(ii) to temper any unintended effects of §7709(b)(2)(B)(i).  Respondents further maintain that States could take advantage of the statute's plain meaning by subdividing their LEAs.  But again, the statute itself contains a remedy.  Under §7713(9)(B)(ii), "[t]he term 'local educational agency' does not include any agency or school authority that the Secretary determines on a case-by-case basis . . . is not constituted or reconstituted for legitimate educational purposes."

\*    \*    \*

The only sure indication of what Congress intended is what Congress enacted; and even if there is a difference between the two, the rule of law demands that the latter prevail.  This case will live with *Church of the Holy Trinity* as an exemplar of judicial disregard of crystal-clear text.  We must interpret the law as Congress has written it, not as we would wish it to be.  I would reverse the judgment of the Court of Appeals.

# SUPREME COURT OF THE UNITED STATES

_____

No. 05–1508

_____

## ZUNI PUBLIC SCHOOL DISTRICT NO. 89, ET AL., PETITIONERS *v.* DEPARTMENT OF EDUCA- TION ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

[April 17, 2007]

JUSTICE SOUTER, dissenting.

I agree with the Court that Congress probably intended, or at least understood, that the Secretary would continue to follow the methodology devised prior to passage of the current statute in 1994, see *ante*, at 7–8. But for reasons set out in JUSTICE SCALIA's dissent, I find the statutory language unambiguous and inapt to authorize that methodology, and I therefore join Part I of his dissenting opinion.